11 CV 3781

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

INSULATORS AND ASBESTOS ) Civil Action No.
WORKERS LOCAL #14, Individually and )
On Behalf of All Others Similarly Situated, )
)
              Plaintiff, )
)
   vs. )
) CLASS ACTION
BANK OF AMERICA CORPORATION; )
BARCLAYS BANK PLC; CITIBANK, )
NA; CREDIT SUISSE GROUP AG; )
DEUTSCHE BANK AG; HSBC )
HOLDINGS PLC; J.P. MORGAN CHASE )
& CO.; LLOYDS BANKING GROUP )
PLC; THE ROYAL BANK OF )
SCOTLAND GROUP PLC; UBS AG; )
WESTLB AG; AND THE NORINCHUKIN )
BANK, )
)
            Defendants. )
---

## CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL ANTITRUST LAWS AND THE COMMODITY EXCHANGE ACT

Plaintiff Insulation and Asbestos Workers Local #14 ("Plaintiff"), by its undersigned counsel, brings this action against Defendants Bank of America Corporation, Barclays Bank plc, Citibank NA, Credit Suisse Group, NA, Deutsche Bank AG, HSBC Holdings plc, J. P. Morgan Chase & Co., Lloyds Banking Group plc, The Royal Bank of Scotland Group PLC, UBS AG, WestLB AB, and The Norinchukin Bank, pursuant to the Sherman Act, 15 U.S.C. § 1, and the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.* (the "CEA"), on behalf of itself and all others who transacted in products linked to the London Interbank Offered Rate hereinafter ("LIBOR") during the period of at least January 1, 2006 through December 31, 2009 (the "Class Period").

Plaintiff's allegations as to itself and its own acts are based upon personal knowledge and as to all other allegations upon information resulting from the investigation of its counsel. The investigation included the review and analysis of, among other things, LIBOR rates and data concerning LIBOR-based financial products; public news reports of the various investigations being conducted by, among others, the U.S. Securities and Exchange Commission ("SEC") and U.S. Department of Justice ("DOJ"); and additional materials.

## I.     SUMMARY OF THE ACTION

1.     This case involves the manipulation and suppression of LIBOR by Defendants during the period 2006 through 2009. LIBOR is a rate that is determined on a daily basis and tied to the interest rates at which banks borrow unsecured funds from other banks in the London interbank lending market. Simply put, LIBOR is the rate at which banks will lend to each other.

2.     As the Defendants are aware, LIBOR is the most important interest rate calculation in the world, with trillions of dollars of loans and other financial products directly tied to it. LIBOR is used in the pricing of numerous financial products and instruments,

including variable rate instruments, interest rate swaps, futures, options, and other products, with outstanding values totaling trillions of dollars.

3. LIBOR is a primary global benchmark for short-term interest rates that is determined on a daily basis by the British Bankers Association ("BBA"). It is based directly on information reported by Defendants and other major banks. By being strategic about the information that they reported, Defendants manipulated the resulting LIBOR rate.

4. Defendants' manipulation of LIBOR had disastrous consequences for the multitude of persons in the United States, including Plaintiff and other similarly situated members of the class, who suffered damages when the value of their LIBOR-based financial products deteriorated because of inaccurate LIBOR representations engineered by the Defendants. Investors, including Plaintiff, were forced to (1) pay more for products tied to LIBOR and/or (2) receive less interest from such LIBOR-based financial products. While Plaintiff and other class members suffered dearly due to Defendants' manipulation of LIBOR, Defendants themselves simultaneously reaped substantial benefits through their trading of enormous amounts of products whose values were directly tied to LIBOR.

5. Defendants' conspiracy to manipulate LIBOR violates § 1 of the Sherman Act and Sections 9(a)(2) and 22(a) of the CEA, and caused Plaintiff and other members of the proposed Class to pay more for or receive less from products that were tied to LIBOR. As such, Plaintiff and members of the proposed Class have been directly injured by Defendants' misconduct.

## II.   JURISDICTION AND VENUE

6. This action is instituted under Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, Sections 4 and 16 of the Clayton act, 15 U.S.C. §§15 and 26, and Section 22 of the CEA, 7 U.S.C. § 25.

7. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 22 of the CEA, 7 U.S.C. § 25.

8. Venue is appropriate in the Southern District of New York pursuant to Section 22 of the CEA, 7 U.S.C. § 25(c), and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period the Defendants transacted business in this District and a substantial portion of the affected interstate commerce described herein was carried out in this District.

## III.   THE PARTIES

A.   **Plaintiff**

9. Plaintiff Insulators and Asbestos Workers Local #14 purchased and sold LIBOR-based financial products during the Class Period, and was thereby damaged by Defendants' conduct as alleged herein.

B.   **Defendants**

10. Defendant Bank of America Corporation ("BoA") is a Delaware Corporation headquartered in Charlotte, North Carolina. Defendant BoA was a member of the BBA's U.S. Dollar LIBOR panel during the relevant period.

11. Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered in London, England. Defendant Barclays was a member of the BBA's U.S. Dollar LIBOR panel during the relevant period.

12. Defendant Citibank NA ("Citibank") is a wholly-owned subsidiary of Citigroup, Inc., a Delaware corporation headquartered in New York, New York. Defendant Citibank was a member of the BBA's U.S. Dollar LIBOR panel during the relevant period.

13. Defendant Credit Suisse Group AG ("Credit Suisse") is a Swiss company headquartered in Zurich, Switzerland. Defendant Credit Suisse was a member of the BBA's U.S. Dollar LIBOR panel during the relevant period.

14. Defendant Deutsche Bank ("Deutsche") is a German financial services company headquartered in Frankfurt, Germany. Defendant Deutsche was a member of the BBA's U.S. Dollar LIBOR panel during the relevant period.

15. Defendant HSBC Holdings plc ("HSBC") is a United Kingdom public limited company headquartered in London, England. Defendant HSBC was a member of the BBA's U.S. Dollar LIBOR panel during the relevant period.

16. Defendant J.P. Morgan Chase & Co. ("J.P. Morgan") is a financial holding company formed under the laws of Delaware and headquartered in New York, New York. Defendant J. P. Morgan was a member of the BBA's U.S. Dollar LIBOR panel during the relevant period.

17. Defendant Lloyds Banking Group plc ("Lloyds") is a United Kingdom public limited company headquartered in London, England. Defendant Lloyds was a member of the BBA's U.S. Dollar LIBOR panel during the relevant period.

18. Defendant Royal Bank of Scotland Group PLC ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland. Defendant RBS was a member of the BBA's U.S. Dollar LIBOR panel during the relevant period.

19. Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland. Defendant UBS was a member of the BBA's U.S. Dollar LIBOR panel during the relevant period.

20. Defendant WestLB AG ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany. Defendant WestLB was a member of the BBA's U.S. Dollar LIBOR panel during the relevant period.

21. Defendant The Norinchukin Bank ("Norinchukin") is a Japanese cooperative bank headquartered in Tokyo, Japan. Defendant Norinchukin was a member of the BBA's U.S. Dollar LIBOR panel during the relevant period.

## IV. FACTUAL ALLEGATIONS

### A. LIBOR

22. LIBOR is set daily by the BBA, which bills itself as the leading trade association for the UK banking and financial services sector. The BBA is an association of 200 member banks from 60 countries, and is funded primarily by subscriptions from its members. Defendants were members of the BBA during the relevant period.

23. As noted above, LIBOR is an acronym for the London Interbank Offered Rate, meaning the rate of interest that would be paid on a loan from one bank to another. LIBOR is the benchmark for the cost of inter-bank borrowing, and is one of the most important and widely used financial baselines as it anchors financial contracts totaling more than $300 trillion – the equivalent of $45,000 for every human being on the planet.

24. LIBOR is computed daily according to a survey administered by the BBA to a fixed panel of 20 large banks. Prior to February 2011, 16 large banks were used. Each bank's representative is asked the following question: "At what rate could you borrow funds, were you

to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 a.m.?" Each morning the representatives provide an answer at 11:00 a.m. London time. The five largest and the five smallest rates are excluded, and the average of the remaining rates determines that day's LIBOR rate.

**B.    Defendants' Conspiracy To Manipulate LIBOR**

25.    Beginning as early as 2006, Defendants herein intentionally created and caused to be created artificial LIBOR rates, including artificially low LIBOR rates. These artificial rates caused various LIBOR-based financial products to trade at artificial levels. Defendants did this in order to project an image of financial strength, because any bank that reported a higher rate than that of the other reporting banks could appear to be in financial trouble. Thus, the banks had an incentive to report similar rates, which caused reported rates to cluster together.

26.    For example, a study reported by The Wall Street Journal (the "Journal") showed that, for the first four months of 2008, the three-month borrowing rates reported by the then-16 reporting banks on the LIBOR panel remained, on average, within a range of only 0.06 of a percentage point. The banks reported these virtually identical borrowing costs despite the fact that certain of the banks were in extreme financial distress, as compared to some of the other reporting banks that were much more financially stable. The Journal article quoted Stanford professor Darrell Duffie as stating that these reported rates are "far too similar to be believed."

27.    In an article titled "Libor Fog: Bankers Cast Doubt On Key Rate Amid Crisis," appearing in the April 16, 2008 edition of the Journal, it was reported that Defendant Citibank had itself acknowledged the disparity in an April 10, 2008, research report by one of its interest rate strategists, Scott Peng. In that research report, Peng wrote that "LIBOR at times no longer represents the level at which banks extend loans to others" and, recognizing the importance and

6

breadth of LIBOR, that "the long-term psychological and economic impacts this could have on the financial market are incalculable." Quotes from Defendant Citibank were among the lowest quotes submitted to the BBA for a vast majority of the time during the Class Period.

28. The April 16, 2008, Journal article also noted that, as early as November 2007, questions about LIBOR had been raised at a Bank of England meeting, citing that the minutes of the meeting which stated that "several group members thought that Libor fixings had been lower than actual traded interbank rates through the period of stress."

29. After being appraised of numerous complaints about the veracity of LIBOR, the BBA stepped in on April 16, 2008, and warned member banks that anyone found reporting artificial inputs would be removed from the survey. Not surprisingly, over the next two days, the three month LIBOR had its largest percentage increase since the market turmoil began in August 2007.

30. Various other news agencies have reported on Defendants' manipulation of LIBOR. For example, On May 29, 2008, *Bloomberg News* reported that Tim Bond, a strategist at Barclay's, also admitted that banks "routinely" misstated borrowing costs to the BBA:

> Banks routinely misstated borrowing costs to the British Bankers' Association to avoid the perception they faced difficulty raising funds as credit markets seized up, said Tim Bond, a strategist at Barclays Capital.
>
> "The rates the banks were posting to the BBA became a little bit divorced from reality," Bond, head of asset- allocation research at Barclays in London, said in a Bloomberg Television interview. "We had one week in September where our treasurer, who takes his responsibilities pretty seriously, said: 'Right, I've had enough of this, I'm going to quote the right rates.' All we got for our pains was a series of media articles saying that we were having difficulty financing."

The *Bloomberg News* article also noted how at least one of the reporting banks who was in a more precarious financial condition than the others, Defendant UBS, somehow managed to report rates that were lower than its peers:

> Rates quoted by Libor members show discrepancies and have little correlation with their costs of insuring debt from default. UBS AG, whose default-insurance costs rose 919 percent between July 2 and April 15 as it racked up $38 billion of writedowns and losses, quoted dollar-borrowing costs that were lower than its rivals on 85 percent of the days during that period, according to data compiled by Bloomberg.

31. Similarly, on June 2, 2008, the *Financial Times* observed, in an article titled "Libor remarks fail to put unease to rest," that "…the rate of borrowing in Libor has lagged behind other market-based measures of unsecured funding used by the vast majority of financial institutions. This has aroused suspicions that the small group of banks which supply the BBA with Libor quotes have understated true borrowing rates so as not to fan fears they have funding problems."

32. On May 29, 2008, the *Journal* issued another article titled "Study Casts Doubt on Key Rate --- WSJ Analysis Suggests Banks May Have Reported Flawed Interest Data for Libor," which concluded that LIBOR had been materially understated by improper submissions made to the BBA by the Defendants:

> The Journal analysis indicates that Citigroup, Inc., WestLB, HBOS PLC, J.P. Morgan Chase & Co. and UBS AG are among the banks that have been reporting significantly lower borrowing costs for the London interbank offered rate, or Libor, than what another market measure suggest they should be.

The *Journal*'s analysis reported that Defendant Citibank's submissions to the BBA were .87 of a percentage point lower than the rate should have been, based upon its calculations using default-insurance market data as a basis for its calculations. Likewise, Defendant WestLB's submissions averaged .70 of a percentage point lower than the *Journal*'s calculations suggest should have

been the case, and the submissions of Defendants J.P. Morgan and UBS were between .43 and .42 of a percentage point too low, respectively.

## V.    GOVERNMENT INVESTIGATIONS

33.    Several governmental agencies, including the U.S. Commodity Futures Trading Commission ("CFTC"), SEC, and DOJ have commenced investigations into the LIBOR reporting practices of the Defendants during the relevant period. Recently it has also been reported that the Federal Bureau of Investigation ("FBI") has joined other regulators in their investigation, and that the FBI's UK equivalent, the Serious Fraud Office, is doing the same.

34.    The government investigations came to light on March 15, 2011, when Defendant UBS disclosed in its annual report on Form 20-F that it had received subpoenas from the CFTC, SEC and DOJ in connection with investigations regarding its submissions to the BBA. Additionally, UBS acknowledged also receiving a request for information from the Japanese Financial Supervisory Agency related to its LIBOR submissions to the BBA.

35.    Since that time, it has been reported that several other of the Defendants are being investigated. Specifically, Citigroup, BoA, UBS and Barclays all received subpoenas connected to the investigation. Further, in March 2011, Defendant WestLB disclosed that it had submitted information in response to a request from U.S. regulators investigating LIBOR manipulation. Recently, on May 16, 2011, Defendant Lloyds revealed that it had received requests for information as part of the ongoing investigation into the manipulation of LIBOR.

## VI.    FRAUDULENT CONCEALMENT

36.    Throughout the relevant period, Defendants have affirmatively concealed from Plaintiff and class members the unlawful combinations, conspiracies and agreements among Defendants alleged herein. Defendants and their co-conspirators conducted their conspiracy

in secret. Upon information and belief, Defendants planned and implemented the conspiracy during non-public meetings, monitored and enforced the conspiracy in non-public meetings, agreed not to discuss or disclose the details of their conspiracy, and provided pretextual and false justifications regarding their role in setting the LIBOR rates and their true cost of borrowing.

37. As a result of Defendants' concealment, any applicable statute of limitations affecting the rights of Plaintiff and class members has been tolled. Plaintiff exercised due diligence to learn of its legal rights, and, despite the exercise of due diligence, did not discover and could not have discovered the unlawful conduct alleged herein at the time it occurred.

## VII.   INTERSTATE TRADE AND COMMERCE

38. The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce. Each of the Defendants was aware that their misconduct in setting an artificially low LIBOR rate would have a direct, substantial and reasonably foreseeable effect on the price of LIBOR-based financial products.

## VIII.   CLASS ACTION ALLEGATIONS

39. Plaintiff brings this action on behalf of itself and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all members of the following Class:

> All persons (excluding governmental entities, Defendants, co-conspirators, and the present and former parents, predecessors, subsidiaries, and affiliates of the foregoing) who at any time during the period from January 1, 2006 through December 31, 2009, purchased or sold LIBOR-based financial products.

40. Plaintiff believes that there are hundreds or thousands of members of the Class, as above described, the exact number and their identities being known by Defendants.

41. The Class is so numerous and geographically dispersed that joinder of all members is impracticable.

42. There are questions of law and fact common to the Class, which questions relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including but not limited to:

   a. Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain and/or stabilize LIBOR;

   b. The identity of the participants in the conspiracy;

   c. The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

   d. Whether the alleged conspiracy violated Section 1 of the Sherman Act;

   e. Whether Defendants took steps to actively conceal the combination or conspiracy from Plaintiff and other Class members;

   f. Whether Defendants' alleged conspiracy violated the CEA;

   g. Whether Defendants' manipulation constituted a manipulative or unlawful act;

   h. Whether Defendants injected into Libor-based financial products illegitimate forces of supply and demand;

   i. Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business and property of the Plaintiff and other members of the Class;

   j. The effect of Defendants' conspiracy on LIBOR during the relevant period; and

   k. The appropriate measure of damages sustained by Plaintiff and other members of the Class.

43. These and other questions of law and fact common to the members of the Class, including legal and factual issues relating to liability, impact, and damages, predominate over any questions affecting only individual members.

44. Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of the Class members, and Plaintiff will fairly and adequately protect the interests of the members of the Class.

45. Plaintiff has purchased or sold LIBOR-based financial products during the relevant period, and its interests are coincident with and not antagonistic to those of the other members of the Class.

46. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

47. A class action provides a fair and efficient method for the adjudication of this controversy. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications.

48. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Such treatment will permit a large number of similarly-situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would require. Class treatment will also permit the adjudication of relatively small claims by many Class members who could not afford individually to litigate claims such as those asserted herein. The Class is readily definable and is one for which records should exist. There are no difficulties likely to be encountered in the management of this class action that would preclude its

maintenance as a class action and no superior alternative exists for the fair and efficient adjudication of this controversy on behalf of Plaintiff and the members of the Class.

49. Defendants and their co-conspirators have acted on grounds generally applicable to all members of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I
### (For Violation of Section 1 of the Sherman Act)

50. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this complaint.

51. Beginning at least as early as January 1, 2006, or earlier, the exact dates being unknown to Plaintiff, Defendants and their co-conspirators engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to artificially lower, fix, maintain, and/or stabilize LIBOR, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

52. In formulating and effectuating the aforesaid contract, combination or conspiracy, Defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including artificially lowering, fixing, maintaining, and/or stabilizing LIBOR.

53. The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among the Defendants in furtherance of which the Defendants fixed, lowered, maintained, and/or stabilized LIBOR. Such contract, combination, or conspiracy constitutes a per se violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

54. The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between

13

and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

55. The contract, combination or conspiracy has had the effect, among others, of misstating LIBOR as lower than it otherwise should have been, thus directly impacting the value of LIBOR-based financial products.

56. As a direct and proximate result of Defendants' scheme, Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in amounts which are presently undetermined. Plaintiff and other Class members have suffered injury in that the value of the LIBOR-based financial products they owned was less than it should have been had LIBOR been accurately calculated and stated. Plaintiff's injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Defendants' conduct unlawful.

## COUNT II
### (For Violation of the Commodity Exchange Act)

57. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this complaint.

58. By their intentional misconduct, the Defendants each violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), and caused prices of LIBOR-based financial products to be artificial, including artificially suppressed, during the Class Period.

59. Defendants' manipulation of LIBOR constituted market manipulation of the prices of LIBOR-based financial products in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

60. Defendants' foregoing manipulative conduct deprived Plaintiff and the other Class Members of a lawfully operating market during the Class Period.

61. Plaintiff and the other Class Members that transacted in LIBOR-based financial products during the Class Period transacted their trades at artificial and unlawful prices resulting from Defendants' misconduct in violation of the CEA, 7 U.S.C. § 1 *et seq.*, and as a direct result, sustained injury and suffered damages.

62. Plaintiff and the other Class Members are each entitled to damages for the violations of the CEA alleged herein.

## COUNT III
### (For Vicarious Liability)

63. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this complaint.

64. Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

## COUNT IV
### (For Aiding and Abetting Violation of the Commodity Exchange Act)

65. Plaintiff incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this complaint.

66. Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each others' manipulation of LIBOR, and willfully intended to assist these manipulations, which resulted in LIBOR-based financial products trading at artificial prices during the Class Period, in violation of the CEA, 7 U.S.C. § 25(a)(1).

## IX. RELIEF REQUESTED

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. That the Court determine that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B. That judgment be entered for Plaintiff and members of the Class against Defendants;

C. Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other relief as the Court may deem just and proper.

## X. JURY DEMAND

Plaintiff demands a trial by jury on all claims so triable.

Dated: June 3, 2011

BARRACK, RODOS & BACINE

_____
A. Arnold Gershon (AG-3809)
William J. Ban (WB-0382)
425 Park Avenue, 31st Floor
New York, NY 10022
Phone: (212) 688-0782
Fax: (212) 688-0783

BARRACK RODOS & BACINE
Gerald J. Rodos
Daniel E. Bacine
Jeffrey B. Gittleman
Chad A. Carder
3300 Two Commerce Square
2001 Market Street
Philadelphia, PA 19103
Phone: (215) 963-0600
Fax: (215) 963-0838